IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EQUAL EMPLOYMENT )
OPPORTUNITY COMMISSION, )
)
      Plaintiff, )
)
  v. ) 1:13-CV-46
)
WOMBLE CARLYLE SANDRIDGE & )
RICE, LLP, )
)
      Defendant. )

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

    The Equal Employment Opportunity Commission has sued Womble Carlyle Sandridge & Rice, LLP, alleging that it violated the Americans with Disabilities Act ("ADA") by failing to accommodate the disability of its employee Charlesetta Jennings and by discharging Ms. Jennings because of her disability. Womble Carlyle has moved for summary judgment. Because Ms. Jennings cannot perform the essential functions of the job with or without a reasonable accommodation, she is not a qualified individual under the ADA, and the Court must grant summary judgment to the defendant.

**FACTS**[1]

    Ms. Jennings began working for Womble Carlyle as an Office Services Assistant in April 2000. (Doc. 29-3 at ¶ 7; Doc. 33-1 at 1.) While her job title and hiring authority shifted over

---

[1] The facts as set forth are either undisputed or viewed in the light most favorable to the EEOC. Record citations are to document and pages numbers appended by the CM-ECF system.

time, she essentially held the same position until she was terminated in August 2011 as a Support Services Assistant ("SSA"). (Doc. 29-3 at ¶¶ 7, 28; Doc. 33-1 at 2-3.)

Womble Carlyle had three work sites for SSAs: the main service center at One West Fourth Street and two smaller service centers at Liberty Plaza and Winston Tower. (Doc. 29-1 at ¶ 8.) SSAs had many duties, and their daily tasks varied significantly. (Doc. 33-1 at 7; Doc. 33-2 at 2; Doc. 33-5 at 6.) The written job description for the position profiles the SSA job as "entry level basic operations" and lists the job duties and responsibilities as follows:

- Runs high volume copy machines; performs binding and finishing work
- Ensures convenience copiers are working; performs routine maintenance repairs
- Maintains records for management and inventory purposes
- Distributes office supplies, fax transmissions and mail as designated
- Utilizes accounting devices as directed to ensure accurate charges
- Responds to and coordinates all service calls
- Delivers work as requested to businesses and residences
- May travel between customer buildings
- Answers customer questions
- Performs duties related to the shipping of materials
- Performs filing duties as assigned
- Performs housekeeping duties as assigned
- Performs message center duties as assigned
- Performs other duties as assigned

(Doc. 33-12 at 1.) The job description[2] further provides that "[s]ome physical effort is required[,] which may involve . . . lifting or moving items weighing up to 75 lbs." (*Id*. at 2.) SSAs often performed tasks alone, and help with heavy lifting was not always available. (*See* Doc. 29-1 at ¶ 35; Doc. 33-5 at 5.)

---

[2] Ms. Jennings testified that she did not see the written job description until after her lifting restrictions associated with her disability were in place, (Doc. 33-1 at 33), and that half the SSAs could not do all the tasks listed in the description. (*Id.* at 35.) But she has not offered evidence to dispute that the job description accurately described what SSAs as a group did.

2

As a group, SSAs handled many tasks, but on an individual level, they tended to specialize on a narrower range of tasks. For example, SSAs in general were responsible for setting up conference rooms, (Doc. 29-1 at ¶ 30(D)), but in practice two SSAs were responsible for this and others assisted only as needed. (Doc. 33-5 at 8-9; Doc. 33-6 at 3-5; Doc. 33-7 at 3-4.) Further, not every SSA was able to perform every task. For example, some SSAs did not have to answer phones or work the Saturday rotation because of language barriers, (Doc. 33-1 at 7-8), and some did not fill in at Liberty Plaza because they were not trained to do so. (Doc. 33-5 at 2.) Beyond these limits, tasks varied throughout the day and from day to day. (Doc. 33-1 at 9; Doc. 33-2 at 2; Doc. 33-5 at 1-2.)

In 2008, in response to the recession, Womble Carlyle reduced the SSA staff by nearly half. (Doc. 29-1 at ¶ 16.) These cuts made it more important for SSAs to be able to handle a variety of functions and to do so independently. (*Id.* at ¶ 17.) For example, only one SSA was assigned to Liberty Plaza at a time,[3] so Ms. Jennings was alone when she filled in there and had to handle all tasks that arose by herself. (*Id.* at ¶¶ 21, 25; Doc. 33-1 at 9.) Only one SSA was assigned to Winston Tower at a time, so Ms. Jennings was alone when she filled in there as well.[4] (Doc. 29-1 at ¶ 25; Doc. 33-1 at 9.)

SSAs spend most of their time on copying, scanning, and printing assignments. (Doc. 33-5 at 3; Doc. 33-6 at 3; Doc. 33-7 at 1.) To complete these tasks, SSAs must lift documents and boxes of paper. (Doc. 33-1 at 17-18.) Depending on the size of the job, documents are grouped in a rubber-banded stack, in folders, or in a banker's box. (*Id.* at 17.) On average,

---

[3] Previously, Liberty Plaza had two SSAs on staff at a time. (Doc. 29-1 at ¶¶ 20-21.)

[4] More recently, Winston Tower does not have an SSA assigned there full-time; rather, SSAs are sent from One West Fourth Street as needed. (Doc. 33-5 at 3.)

3

banker's boxes weigh fifteen to twenty pounds, (Doc. 33-5 at 4), but if full they weigh more than twenty pounds. (Doc. 33-1 at 17.) Copy paper is packaged in boxes that weigh fifty pounds or more. (*Id.* at 3; Doc. 33-5 at 5.) SSAs have to move these boxes for their own projects and for deliveries to staff on other floors. (Doc. 33-5 at 6.) Although copy and scan jobs are sometimes delivered to the copy center, usually SSAs have to retrieve them from legal staff. (*Id.* at 4.)

Ms. Jennings spent most of her time copying, scanning, and printing documents. (Doc. 29-4 at 23, 30, 44.) She also had other regular duties, including some that involved lifting, such as shipping and receiving packages. (Doc. 29-5 at 1-2; Doc. 33-1 at 14, 27; Doc. 33-2 at 2.) Most packages weighed less than twenty pounds, but some weighed more. (Doc. 33-1 at 14.)

Other SSAs regularly performed job duties which involved lifting over twenty pounds, (Doc. 29-1 at ¶ 12), and Ms. Jennings occasionally either filled in or assisted with those tasks. For example, once for two weeks Ms. Jennings was required to do mail runs to the various office floors; this required lifting mail buckets that weighed more than ten pounds and possibly more than twenty pounds. (Doc. 33-1 at 14-15.) She also occasionally delivered fifty-pound boxes of copy paper when the SSAs who usually did this job were unavailable. (*Id.* at 3.)

In July 2008, Ms. Jennings was diagnosed with breast cancer. (*Id.* at 21.) She took a short leave of absence and then worked with some limitations while she was treated over the next several months. (*Id.* at 21-23.) In May 2009, she was released to regular duty. (*Id.* at 24.)

In the fall of 2009, Ms. Jennings began to notice swelling and tenderness in her left arm, (*id.* at 25), which doctors diagnosed as a slight case of lymphedema stemming from her breast cancer treatment, (*id.* at 25-26), and triggered by heavy lifting.[5] (Doc. 33-2 at 5-6.) Ms.

---

[5] It appears Ms. Jennings did not discuss lifting restrictions or her problems with lifting with anyone at Womble Carlyle at this time. (Doc. 33-2 at 1.)

4

Jennings modified her work processes to avoid lifting and carrying heavy items. (Doc. 33-1 at 18.) For example, instead of moving a whole box of paper, she broke the box down into manageable subparts. (*Id.*) Rather than carrying a heavy box sealed for shipping, she slid it off a table onto a chair with wheels and pushed it to the designated area. (*Id.*)

Despite these efforts, there were some occasions where heavy lifting was unavoidable. (Doc. 29-5 at 3-4.) In June 2010, Ms. Jennings had to miss work twice because of lymphedema pain stemming from heavy lifting at work: once from lifting heavy packages alone at Liberty Plaza and once from lifting heavy packages alone at Winston Tower. (Doc. 29-2 at 21; Doc. 29-5 at 27-29, 33-34.) After these incidents, Ms. Jennings's doctors submitted a note to Womble Carlyle stating she should not lift more than ten pounds. (Doc. 29-3 at 28; Doc. 33-1 at 28-29.)

With a ten-pound limit, Ms. Jennings was unable to fill in at Liberty Plaza and Winston Tower or to work the Saturday shift because she would be alone in those posts and heavy lifting could arise that she could not avoid with modified methods. (Doc. 29-5 at 50-51; Doc. 36-6 at 10.) She could not lift boxes full of copy paper or documents. (Doc. 33-2 at 2.) She could not do mail runs because it required lifting mail buckets that could weigh more than ten or twenty pounds. (Doc. 33-1 at 14-15; Doc. 33-2 at 2.) She could not replenish supplies, set up conference rooms, assist with hospitality, complete courier runs or express delivery involving heavy packages, help with office moves (other than cleaning), or provide trial support. (Doc. 29-1 at ¶ 30; Doc. 29-2 at ¶ 33; Doc. 33-2 at 2-3.)

On the other hand, she was able to prepare packages for shipping and work on copying, printing, and scanning projects at One West Fourth Street, using modified methods to avoid heavy lifting. (Doc. 33-2 at 1-2; s*ee also* Doc. 29-5 at 2-3 (noting that she was unable to use modified lifting methods for packages at Liberty Plaza).) Other tasks that met her weight

5

restrictions included quality control work, book binding, Bates stamping, mail sorting, sending faxes, relieving a receptionist and a telephone operator, delivering small items, straightening up the service center, and some cleaning associated with office moves. (Doc. 33-2 at 1-2.)

Shortly after her injury in June 2010, Ms. Jennings and other SSAs began spending a significant amount of time on an internal, non-client related, one-time scanning project. (Doc. 29-2 at ¶¶ 44-47; Doc. 33-1 at 30.) They completed this project around late 2010 or early 2011. (Doc. 33-2 at 3.) Although the scanning boxes weighed between thirty and fifty pounds, Ms. Jennings avoided lifting more than ten pounds at a time by removing items in smaller quantities from the boxes. (*Id.* at 2.)

In January 2011, Tracey Lawrence and Deborah Isley from Womble Carlyle's human resources department met with Ms. Jennings to discuss her lifting restrictions. (Doc. 33-1 at 32-34.) They showed Ms. Jennings a job description that stated SSAs had to be able to lift up to seventy-five pounds, which Ms. Jennings had not seen before, and told her to discuss this with her doctor. (*Id.* at 33-34.) On February 1, 2011, Ms. Jennings's doctor sent Womble Carlyle an updated note stating that she could lift no more than twenty pounds due to the lymphedema, and that this restriction was permanent. (*Id.* at 33.) With a twenty pound limit, Ms. Jennings was unable to perform many SSA tasks. (Doc. 29-1 at ¶ 54; Doc. 29-2 at ¶ 52; Doc. 29-3 at ¶ 22.)

On February 9, 2011, Ms. Jennings's manager, Yvonne Pierberg, told her that she was being placed on medical leave because she could not lift seventy-five pounds. (Doc. 33-1 at 35.) In August 2011, after six months of medical leave with no change in her lifting restriction, Womble Carlyle terminated Ms. Jennings's employment. (Doc. 29-1 at ¶ 60; Doc. 29-3 at ¶¶ 26-28.)

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing pre-2010 amendment Rule 56(c)). "As to materiality . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the non-moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The party seeking summary judgment bears the burden of showing an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 323. If the moving party sufficiently supports its motion for summary judgment, the burden shifts to the non-moving party to set forth specific facts illustrating genuine issues for trial. *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). On those issues for which the non-moving party has the burden of proof, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in the rule. Fed. R. Civ. P. 56(c); *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993); *see also Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393 (4th Cir. 1994) (noting that "under *Celotex*, the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." (internal quotation marks omitted)). The court's role

7

is to determine whether there is a genuine issue based upon the facts, and "not . . . to weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249.

## II. Application

Under the ADA, employers cannot "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Womble Carlyle does not dispute that Ms. Jennings is disabled or that it had notice of her disability. The dispute turns on whether Ms. Jennings is a "qualified individual" under the ADA. *See generally Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (listing elements for prima facie failure to accommodate claim under the ADA). A "qualified individual" is a person "who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Determining whether a function is essential "initially focuses on whether the employer actually requires employees" to perform the function. 29 C.F.R. Part 1630, App. § 1630.2(n).[6] If so, the focus shifts to determining "whether removing the function would fundamentally alter that position." *Id.* There are several sources of evidence relevant to these determinations, including, but not limited to:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

---

[6] The Fourth Circuit has cited the EEOC's ADA regulations in numerous cases, giving them deference. *See, e.g.*, *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 331-32 (4th Cir. 2014) (deferring to EEOC's reasonable interpretation of ADA); *Wilson*, 717 F.3d at 345-46.

8

29 C.F.R. § 1630.2(n)(3). Although the time spent performing a function is relevant, a function may be essential even if infrequent. *See* 29 C.F.R. Part 1630, App. § 1630.2(n). In positions where the employer has a legitimate reason to expect employees to rotate through multiple duties, an employee "will not be qualified for the position unless [s]he can perform enough of these duties to enable a judgment that [s]he can perform its essential duties." *Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 485 (7th Cir. 1997) (emphasis omitted); *cf. Whitworth v. Freightliner Corp.*, 229 F.3d 1146 (table), 2000 WL 1139529, at *2 (4th Cir. Aug. 11, 2000) (citing *Miller* for holding that employers can require that employees "be able to perform multiple duties for a particular job."). A job function is essential when it "bear[s] more than a marginal relationship to the job at issue." *Tyndall v. Nat'l Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir. 1994); *accord Rohan v. Networks Presentations LLC*, 375 F.3d 266, 279 (4th Cir. 2004).

Considering all of the evidence in the light most favorable to the EEOC and in view of the factors set forth in 29 C.F.R. § 1630.2(n)(3), lifting more than twenty pounds is an essential function for SSAs and no reasonable jury could conclude that it was not. The job description, Womble Carlyle's judgment, and the consistent work experience of SSAs including Ms. Jennings all compel this conclusion.

First, the job description states that SSAs must be able to do heavy lifting,[7] and it includes several tasks that require the ability to lift more than twenty pounds, including moving boxes associated with copy jobs and shipping and mail duties. (Doc. 33-12.) In Womble

---

[7] The EEOC has offered evidence that the requirement to be able to lift seventy-five pounds was not an essential function, and a jury could conclude that this requirement was marginal. SSAs recalled few, if any, occasions where they had to lift seventy-five pounds or more. (Doc. 33-1 at 35; Doc. 33-5 at 5-6; Doc. 33-7 at 3.) However, the more pertinent inquiry is whether the job required lifting more than twenty pounds, because that was Ms. Jennings's lifting limit when she was terminated.

9

Carlyle's judgment, lifting more than twenty pounds was essential because most SSA tasks required such lifting. (Doc. 29-1 at ¶ 54; Doc. 29-2 at ¶ 52; Doc. 29-3 at ¶ 22.) Moreover, the experience of SSAs confirms that lifting more than twenty pounds is an essential function of the job. SSA testimony reflects without dispute that duties related to receiving and shipping packages, mail distribution, conference room arrangement, trial preparation, and copying and scanning all involved heavy lifting, as did working at Liberty Plaza and Winston Tower. (Doc. 29-5 at 27-29, 33-34; Doc. 30-3 at 18-19, 39-41; Doc. 30-4 at 16-18, 21, 32-34; Doc. 30-5 at 12, 19, 24-25; Doc. 33-1 at 14-15.) Finally, an employee who could not lift over twenty pounds would require help with numerous tasks, (Doc. 29-2 at ¶ 38), and would not have the flexibility to fill in when there was a possibility heavier lifting would be required. (*Id.* at ¶ 50.) With only a "limited number of employees available among whom the performance of that job function can be distributed," 29 C.F.R. § 1630.2(n)(2)(ii), and significant consequences of not requiring one employee to perform heavy-lifting tasks, *id.* § 1630.2(n)(3)(iv), removing those tasks would fundamentally alter the SSA position. *Cf. Dropinski v. Douglas Cnty.*, 298 F.3d 704, 709 (8th Cir. 2002). Therefore, lifting more than twenty pounds was an essential function for SSAs.

The EEOC contends the only essential SSA functions were copying, scanning, and printing and has offered evidence that these tasks were the primary functions of an SSA. (Doc. 33-5 at 3; Doc. 33-6 at 3.) But the testimony of Ms. Jennings and other SSAs shows without dispute that SSAs were also required to do a variety of other tasks, many of which involved lifting more than twenty pounds. Further, although some SSAs were excused from particular tasks, no evidence suggests that there is or ever has been an SSA whose job was limited to only copying, scanning, and printing, or who did not have to lift more than twenty pounds.

The EEOC also contends that Ms. Jennings personally was never required to do some of the tasks that involved heavy lifting and that, more generally, many of these tasks were rarely required of any SSA. While Ms. Jennings's personal experience is informative, the focus is on the SSA position generally. *See* 29 C.F.R. Part 1630, App. § 1630.2(n) ("If . . . the employer has never required *any* employee in that particular position to type, this will be evidence that typing is not actually an essential function of the position." (emphasis added)); *cf. Dropinski*, 298 F.3d at 709 (holding that the plaintiff's "specific personal experience is of no consequence in the essential functions equation" and "it is the written job description, the employer's judgment, and the experience and expectations of all [persons holding the position] generally which establish the essential functions of the job."). The EEOC has presented evidence that not all SSAs were called upon to do every single heavy-lifting task, but it is undisputed that all SSAs, including Ms. Jennings, were routinely required to perform some tasks involving heavy lifting and that even if certain SSAs had primary responsibility for these tasks, others were required to fill in as needed.

The result is the same if one looks just at Ms. Jennings's experience. It is undisputed that she was required to lift more than twenty pounds in connection with several aspects of her work, until her disability changed her work duties.[8] Indeed, the consequences of not requiring Ms. Jennings to lift more than twenty pounds show that this function is essential, even if she personally did not spend much time doing such lifting. *See Dropinski*, 298 F.3d at 709; 29 C.F.R. Part 1630, App. § 1630.2(n). If all lifting over twenty pounds was removed from her duties, all of the heavy-duty work, solo assignments at Winston Tower and Liberty Plaza, and

---

[8] Many of the EEOC's citations to the record concern testimony about Ms. Jennings's work in the months after the ten-pound weight limit was imposed. That is not the relevant inquiry. By temporarily accommodating an employee's restrictions, an employer does not concede that a particular function is not essential. *See, e.g.*, *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 25-26 (1st Cir. 2001) (collecting cases); *accord Rehrs v. Iams Co.*, 486 F.3d 353, 358 (8th Cir. 2007).

Saturday shifts would be done by other SSAs, forcing them to work harder and longer. (Doc 29-2 at ¶ 50.) Further, Ms. Jennings's restrictions changed her work structure in a way that caused Ms. Jennings herself to complain: light-duty and lower priority projects were set aside for her, making her feel "singled out." (Doc. 29-1 at ¶¶ 47-48; Doc. 29-2 at ¶ 51.) Overall, Ms. Jennings's limitations reduced the department's flexibility and level of service and meant that two SSAs were required for tasks typically performed by one SSA. (Doc. 29-1 at ¶¶ 35-36; Doc. 29-2 at ¶¶ 18, 38-39, 50.)

While Ms. Jennings cannot lift more than twenty pounds, she may still be a qualified individual if she can perform this function with a reasonable accommodation. *See* 42 U.S.C. § 12111(8). The EEOC has presented evidence that Ms. Jennings was able to undertake copy and scan jobs and some shipping duties at the One West Fourth Street location, where she was able to move heavy boxes without lifting them. If that were the only accommodation needed, she might well be qualified.

Even with her modifications, however, Ms. Jennings was unable to work at Liberty Plaza or Winston Tower, work the Saturday shift, deliver mail to the floors, deliver boxes of copy paper, pick up or deliver copy jobs weighing more than twenty pounds, lift or carry packages weighing over twenty pounds that needed to be shipped or mailed, move heavy furniture, or complete other tasks that involved or could involve lifting more than twenty pounds. It is not a reasonable accommodation to excuse her from all of these tasks, because doing so would force Womble Carlyle to create a modified light-duty position, which the ADA does not require. *See Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 482 (4th Cir. 2010) (noting that the ADA does not require employers to assign an employee to "permanent light duty" or to "reallocate job duties in order to change the essential functions of a job" (quotation marks

omitted)); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001) ("While it is true that the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions, employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists.").

The only other accommodation suggested by the EEOC that would allow Ms. Jennings to perform enough tasks would be to ensure she has help from another SSA for any heavy lifting. Courts generally find that providing a helper is not a reasonable accommodation because doing so requires "another person to perform an essential function of the employee's job," *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 199 (7th Cir. 2011) (collecting cases); thus the accommodation reallocates essential job functions, rather than enabling the employee to perform them. *See id.* Requiring another SSA to assist Ms. Jennings with all lifting beyond her weight limits would, as noted, turn tasks typically handled by one SSA into tasks requiring two SSAs. (Doc. 29-2 at ¶ 38.) This would in effect reallocate essential functions, which the ADA does not require. *Cf. Shin*, 369 F. App'x at 482 (citing cases for propositions that the ADA does not require employers to "hire an additional person to perform an essential function of a disabled employee's position" or to implement accommodations that force other employees to work harder or longer).

The EEOC has cited cases to suggest that help with lifting can be a reasonable accommodation. *See Green v. CSX Hotels, Inc.*, Civil Action No. 5:07-0369, 2008 WL 5516474, at *9 (S.D.W. Va. Sept. 5, 2008), *recommendation adopted in part by* 650 F. Supp. 2d 512 (S.D.W. Va. 2009) (holding that there was a disputed issue of fact as to employer's lifting requirement in part because waitresses could receive assistance from other employees); *Barnes v. Nw. Iowa Health Ctr.*, 238 F. Supp. 2d 1053, 1083 (N.D. Iowa 2002) (holding that there was a disputed issue of fact as to employer's lifting requirement because help with lifting residents was

13

readily available and lifting was typically performed by more than one employee). However, those cases are inapposite because help was readily available. Here, in contrast, it is undisputed that help with lifting was not available for SSAs working the Saturday shift or when filling in at Winston Tower and Liberty Plaza, (Doc. 29-1 at ¶¶ 21, 25, 30(M); Doc. 33-1 at 9), and that help was not always available even at One West Fourth Street, where SSAs were busiest. (*See* Doc. 29-1 at ¶¶ 24, 35; Doc. 33-5 at 5.) Thus, these cases do not support the EEOC's position.

## CONCLUSION

Ms. Jennings is not a qualified individual under the ADA because she cannot lift more than twenty pounds, which is an essential function of the SSA job, and because the EEOC has not identified any reasonable accommodation that would allow her to perform this essential job function. The Court must therefore grant summary judgment to Womble Carlyle.

For the reasons stated, it is **ORDERED** that Womble Carlyle's motion for summary judgment, (Doc. 27), is **GRANTED** as to all claims.

This the 26th day of June, 2014.

_____
UNITED STATES DISTRICT JUDGE